IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-60,434-02






EX PARTE JOSE CAVAZOS, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM WILLACY COUNTY






 Johnson, J., dissents to denial of relief.


D I S S E N T I N G S T A T E M E N T



 In applicant's trial for murder, the state's primary witness was the co-defendant, who was an
accomplice as a matter of law. Applicant alleges that his trial counsel was ineffective for failing to
request an accomplice-witness instruction. (1) On appeal, the court of appeals held that the failure to
request the instruction was error, but found it harmless because the state had produced "ample
corroboration evidence."

 The court of appeals listed a number of findings to support its conclusion that the failure to
request an accomplice-witness instruction was harmless.

1. Appellant had a motive to kill the victim.

 Appellant had confronted the victim the week before the murder because he had heard a
rumor that the victim had had an affair with applicant's wife. Motive is not evidence of
guilt, nor does it "tend to connect" applicant to the crime. And this ignores other testimony
from an uninvolved witness that, a few minutes before applicant confronted the victim about
the rumored affair on the night of the murder, the co-defendant had confronted the victim
about the victim hassling the co-defendant's wife.

2. The victim's blood was found on the front passenger seat of the co-defendant's car.

 This evidence does not tend to connect applicant to the crime.

3. Applicant had owned a .22 caliber semi-automatic handgun.

 Such guns are very common, and mere ownership of a weapon of a similar type does not tend
to connect applicant to the crime. 

4. The victim was shot from behind with a small-caliber weapon.

 There are other small caliber weapons, such as .25 and .32, but the casing found in the back
seat suggests that the gun was a .22. The bullet fragmented, as .22 caliber bullets are prone
to do, and the murder weapon was not recovered. There is no way to connect the casing or
the bullet to any gun, much less a gun owned by applicant.

5. Applicant had a box of .22 caliber ammunition at his parents' home.

 If one owns a certain caliber gun, it is reasonable to own ammunition for it, but again based
on my experience, the ammunition is usually kept with the weapon, not at the home of
someone else.

6. An FBI firearms examiner determined that the spent .22 caliber casing found in the rear seat of
the co-defendant's car was made by the same company that made the cartridges in the box of
ammunition.

 Four companies, Federal, Remington, Winchester, and CCI, are the leading manufacturers
of bullets, based on volume. Wal-Mart and K-Mart together sell more than half of the .22
caliber bullets sold in the United States. Annual production of .22 caliber bullets in the
United States is estimated at 2-2.5 billion rounds; .22 caliber is by far the most common
bullet in the retail market and drives the industry "24/7." 

7. The FBI firearms examiner determined that the same tool made the spent casing as well as eight
of the cartridges in the box of ammunition.

 Manufacturers turn out millions of bullets every day from a finite number of machines
(bunters). A typical batch of bullets from a single source is anywhere from 39 to 54 million
rounds. If the life of a bunter exceeds a single "melt," the bunter may make its mark on more
than 100 million casings. The casings from each bunter generally go into a collecting bin
with the output of one or more other bunters. This mixture of bunter output is randomly
boxed, usually in boxes of 50 rounds, and it is highly probable that a given box will contain
bullets produced by each bunter that emptied into a given collection bin. Ammunition is sold
to retailers in pallet quantities. The odds are that any box of bullets purchased from a major
retailer, such as Wal-Mart, in the same market area would contain casings from the same
bunter as the spent casing. In this case, eight out of fifty rounds were found to be from the
same bunter, the others may therefore be assumed to be from one or more other bunters.


8. A DPS firearms examiner found lead residue, consistent with that of a firearm, on the front
passenger seat of the co-defendant's car.

 No one disputed that a gun was fired in the co-defendant's car. This does not connect
applicant to the crime because we do not have sufficient information about the location of
the residue on the front passenger seat. 

 If the driver fired the shot, residue would be on the side and front of the front seat and,
perhaps, the headrest, and there might well be a residue "shadow" on the seat where the
residue fell onto the victim rather than on the seat. 

 If the shot was fired from the back seat, residue would be on the back of the front seat and
on the back of the headrest and there would be no "shadow" on the seat. 

 Because of lack of information, I cannot address the differing patterns deposited by residue
from the barrel and residue from the ejection port; these exits for residue are typically 90º
apart and leave different patterns of residue.

9. The DPS firearms examiner opined that the residue patterns were consistent with the weapon
being held above the car seat at a downward direction and not sideways. 

 See point 8. The state argued that the residue pattern was consistent with the victim being
shot by someone sitting in the back seat. "Consistent with" is not "is." The only direct
evidence of the identity of that person was the testimony of the co-defendant. To argue as
it did, the state presumed that, since the co-defendant owned the car, he was driving. Based
on years of reading opinions and briefs, it is evident to me that "owner" does not precisely
equate to "driver."


10. The co-defendant carried the victim's body from the car, spilling the victim's blood on his boots
and pants.

 This is highly incriminating for the co-defendant, but it does not tend to connect applicant
to the crime.

Conclusion

 Given these circumstances, I cannot conclude that the absence of an instruction on
corroboration of an accomplice's testimony was harmless.


Filed: July 1, 2009

Do not publish
1. Trial counsel was apparently disciplined for this lapse.